## MERCHANTS' & MINERS' TRANSP. CO. v. BRANCH.

## THE INDIAN.

(Circuit Court of Appeals, Fourth Circuit.   July 5, 1922.)

No. 1979.

1. **Carriers ⬦➾86—May sell or otherwise dispose of perishable goods, which cannot be delivered in accordance with bill of lading, after notice to owner.**

   The carrier's obligation to deliver goods according to the bill of lading is qualified by his right and duty to sell perishable goods, which cannot be delivered as required by the bill of lading; but sale or other disposition without notice to the owner or other person concerned, when notice can be given, makes the carrier liable for the value of the goods.

2. **Carriers ⬦➾86—Not excused from giving owner notice of necessity of disposing of perishable goods by fact that intended purchaser has notified owner of necessity of disposition.**

   Where perishable goods cannot be delivered in accordance with the bill of lading, the carrier is not ordinarily excused from selling the goods without notice to the owner by the fact, known to the carrier, that the intended purchaser has himself given the owner notice of the necessity of disposition.

3. **Carriers ⬦➾86—When goods cannot be delivered as directed, carrier becomes trustee for owner, required to use reasonable efforts to protect him from loss.**

   When goods cannot be delivered as directed, the carrier becomes a trustee for the owner, charged with the duty to use all reasonable efforts to protect him from loss.

4. **Carriers ⬦➾87—Owner, with notice that goods cannot be delivered, required to give carrier directions as to disposal of goods.**

   As soon as the owner has credible evidence that contract of carrier cannot be carried out, it is his duty to relieve the carrier of responsibility by giving new directions as to disposition of goods.

5. **Carriers ⬦➾83—Loss from delay in disposition of potatoes, caused by nonarrival of bill of lading, charged to shipper, because of his negligence in not giving instructions as to disposition.**

   Where seller, who had shipped potatoes to a tropical country, had received several urgent notices from the buyer that the potatoes were ready for delivery, but that the bill of lading had not arrived, the loss from delay in disposition of the potatoes should be charged to his own negligence in failing to give prompt instructions to the carrier, or to his own agent at point of destination, for their disposition.

6. **Carriers ⬦➾94(4)—Price at which shipper had agreed to sell potatoes held properly adopted as the fair wholesale market price, in action against carrier for delivery of potatoes without bill of lading.**

   In shipper's action against carrier for loss caused by carrier's delivery of potatoes to other party without bill of lading, in which there was no definite evidence of the wholesale market price of potatoes at place of delivery, and the only definite measure of damages indicated by the evidence was the price at which the shipper had agreed to sell the potatoes to such other party, the adoption of such price as the fair wholesale market price *held* proper.

7. **Carriers ⬦➾83—Not authorized to dispose of perishable goods on credit.**

   Where carrier was required to sell perishable goods because of nonarrival of bill of lading, it had no authority to sell the goods on credit, and was required to account to shipper as if it had received the cash value of the goods.

⬦➾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. Carriers ⊚⇒94(4)—Shipper's failure to collect check sent by buyer for goods delivered by carrier without bill of lading, being part of shipment, did not affect amount of shipper's recovery from carrier.

Where carrier delivered potatoes without bill of lading to buyer to whom shipper had sold potatoes, after a part thereof had rotted because of nonarrival of bill of lading, without requiring the buyer to pay therefor, the shipper's refusal to collect check sent by the buyer for unrotted potatoes, without agreement on shipper's part to release the carrier and look to buyer for payment, did not entitle the carrier to credit for amount of check on amount for which it was liable to the shipper for delivery of goods to buyer.

Cross-Appeals from the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Libel by C. C. Branch against the Merchants' & Miners' Transportation Company, claimant and owner of the steamship Indian. From the decree rendered, the respondent appeals, and libelant cross-appeals. Affirmed.

Leon T. Seawell, of Norfolk, Va. (T. H. Swank, of Baltimore, Md., and Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellant and cross-appellee.

George M. Lanning, of Norfolk, Va., and J. Gordon Bohannan, of Petersburg, Va. (Baird, White & Lanning and Edward R. Baird, Jr., all of Norfolk, Va., on the brief), for appellee and cross-appellant.

Before KNAPP, WOODS, and WADDILL, Circuit Judges.

WOODS, Circuit Judge.   On April 20, 1920, libelant, C. C. Branch, delivered to respondent, Merchants' & Miners' Transportation Company, on the steamship Indian, 2,025 sacks of potatoes, consigned to his own order, Havana, Cuba, notify Jose Perez & Co.  Branch made his draft for the purchase money, $22,781.25, with bill of lading attached, in favor of First National Bank of Newport News.  The potatoes were promptly transported, and reached Havana early in May.  The draft and bill of lading were mailed to Banco Espanol de la Isla de Cuba, but they did not reach that bank until June 25, 1920.

On May 12, 13, and 15, Perez & Co. notified Branch by cablegrams and letters of the nonarrival of draft and bill of lading, without response from Branch.  On May 18 they cabled notice of nonarrival of documents and of damage from rot, and asked, "If we pay your draft, will you protect us against loss from rot?"  To this Branch answered next day, "Will protect; also tracing drafts."

On May 21, Perez & Co. by letter and cable notified Branch that the documents were still missing, that they had obtained the potatoes by giving guaranty to custom house, that shipment was badly damaged by rotting, that they were sorting the potatoes and would cable extent of damage, and would expect Branch to instruct bank to reduce draft.  On May 26 Perez & Co. cabled:

"Finished sorting your potatoes Total rotten 566 sacks Not delivered by steamship 289 Total shortage 855 sacks Instruct Bank reduce draft nine thousand six hundred eighteen seventy five Documents not here yet."

The next day they sent a letter claiming further deduction:

"Because of damage in this shipment we have been obliged to pay the following amount: Duty on 566 sacks of rot $283; labor sorting, $600; and new sacks to the amount of $350."

To none of these cables did Branch make any response. On May 27 he answered the letter of the 21st, questioning the alleged rotting of the potatoes, and complaining that Perez & Co. had not promptly given security and obtained delivery to them. The transportation company was advised of the correspondence between Perez & Co. and Branch; and without authority from Branch, on or about May 26, to prevent further loss from decay, delivered the potatoes to Perez & Co. on the faith of a written guaranty from them against any claim of Branch.

When the original draft and bill of lading at last reached Banco Espanol de la Isla de Cuba, on the 25th of June, it was the next day presented to Perez & Co. They refused payment, saying a deduction was to be made. The Havana bank reported to the Newport News bank, and received a reply denying the claim of deduction. Upon a second presentation Perez & Co. again refused payment, saying they had arranged matters with Branch. Nothing further was done about the matter until the 20th of August. On that date Perez & Co. sent a letter and statement to Branch, in which they claimed deductions of 566 sacks rotten potatoes and 289 sacks short, amounting to $9,618.95. They claimed a further deduction of $1,500 due them on another transaction. Taking the aggregate from $22,781.25, a balance was left as due Branch of $11,662.50. For this sum they inclosed check intended as full settlement.

Branch retained the check without reply until September 13, when he returned it in a letter claiming the whole purchase price of $22,-781.25 to be due to the Newport News bank. On October 5 Perez & Co. again sent check for $11,662.50. This check was returned by Branch on October 14. On October 25 Perez & Co. notified Branch by letter that the bank on which the check was drawn had suspended payment, and that they would hold him responsible for the loss due to his failure to present the check for payment.

On February 2, 1921, Branch filed his libel against Merchants' & Miners' Transportation Company, owner of the steamship Indian, alleging liability of the vessel and owner to the amount of $22,781.25 for the unlawful delivery of the potatoes to Perez & Co. without presentation of the bill of lading. The District Court decreed in favor of the libelant for $16,413.75, being the price at which Branch had agreed to sell the potatoes to Perez & Co. less the agreed price of 566 sacks found to have become worthless by decay before delivery to Perez & Co.

[1-4] The carrier's obligation to deliver goods according to the bill of lading is qualified by his right and duty to sell perishable goods which cannot be delivered as required by the bill of lading. But sale or other disposition, without notice to the owner or other person concerned, when notice can be given, makes the carrier liable for the value of the goods. 4 R. C. L. 307; 10 C. J. 107; 45 L. R. A. (N. S.)

18, note. We do not think the carrier is ordinarily excused from the duty to give the owner notice by the fact, known to the carrier, that the intended purchaser of the goods has himself given notice to the owner of the necessity of disposition, for the purchaser may be interested to misrepresent. But these rules are not inflexible. They are based on the fact that, when goods cannot be delivered as directed, the carrier becomes a trustee for the owner, charged with the duty to use all reasonable efforts to protect him from loss. As soon as the owner has credible evidence that the contract of carriage cannot be carried out, it is his duty to relieve the carrier of responsibility by giving new directions.

[5] Here it is true the carrier did not itself notify Branch of the delay. But he had from Perez & Co. several urgent notices of the nonarrival of the bill of lading, indicating anxiety to get the potatoes, and he knew the potatoes would soon decay while being held in a tropical country. Under the special circumstances Branch had every reason to credit the notice from Perez & Co. that the bill of lading had not arrived and that the potatoes were rotting, and the loss from delay in disposition of them should be charged to his own negligence in failing to give prompt instructions to the carrier, or to Hill, his own Havana agent, for their disposition.

[6] The evidence fails to show that the potatoes could have been sold at wholesale on the Havana market for more than Perez & Co. had agreed to pay Branch for them. Some of them, it is true, were retailed by Perez & Co. for a greater price; but there is no definite evidence of the wholesale market price. It is well known that the wholesale and retail prices of perishable produce are often far apart. Branch knew the conditions; he had an agent in Havana, through whom he could have sold. He could not require respondent to account for more than the fair wholesale market price, and the price at which he had sold Perez & Co. was the only definite measure of damages indicated by the evidence. Indeed, the libel is founded on this valuation. We think it was properly adopted by the District Court. The finding of the District Court as to the quantity lost by decay has abundant support in the testimony.

There is some conflict in the evidence as to the shortage now alleged of 289 sacks claimed as a credit. But this evidence was irrelevant, since respondent in its answer admits receiving from Branch 2,025 sacks and alleges no shortage.

[7] The law gave the carrier no authority to dispose of the potatoes on credit. Nor did Branch authorize it to do so. He certainly had nothing to do with passing on the sufficiency of the security taken. The carrier assumed the risk of taking security from Perez & Co. and of its adequacy, and must account to Branch as if it had received the cash value of the goods. Yet it was the duty of Branch to minimize the loss, if he could do so without prejudice to himself. Was there loss by reason of the failure of Branch to collect the check sent by Perez & Co.? If so, was Branch responsible, and accountable to the carrier for the loss?

The proof does not seem sufficient to warrant an affirmative answer to the first question. It is true that the bank on which the check, twice sent by Perez & Co., was drawn, suspended payment, and that the check would probably have been paid if Branch had sent it forward promptly for collection. But there was no proof that Perez & Co. ultimately lost the whole or any part of the funds on deposit to meet the check.

[8] It is also true that, although the check was sent by Perez & Co. as full payment, it was not conditioned on a receipt in full, and Branch could have notified them that it was accepted only as a payment on account and sent it forward for collection, without prejudice to any claim he might have asserted against Perez & Co. for the balance due. 26 R. C. L. 640; Reynolds v. Prince, 88 S. C. 525, 539, 540, 71 S. E. 51, and authorities cited. Hence, if Branch had agreed to release the carrier and accept Perez & Co. as his debtors for the value of the sound potatoes, it might well be argued that he should be required to account to Perez & Co. for any loss due to his failure to collect the check or return it promptly. But Branch did not at any time agree to release the carrier and look to Perez & Co. He made no agreement with Perez & Co. except to protect them against loss on rotten potatoes if they paid the original draft. As Perez & Co. did not pay the draft this agreement was never in effect. This being so, we do not see how the carrier could require Branch to look to Perez & Co. or accept payment from them, or could charge Branch and credit itself with any loss suffered by Perez & Co. by the failure of the bank in which they had deposited funds to meet the check. On the other hand, if Branch had accepted and collected the check of Perez & Co. he might have been held to have thereby intended to release the carrier and accept Perez & Co. as his debtor. Kewanee Private Utilities Co. v. Norfolk So. Ry. Co., 118 Va. 628, 88 S. E. 95. This he was under no obligation to do. It follows that the respondent is not entitled to credit for the uncollected check of Perez & Co. in favor of Branch for $11,662.50.

Of course, we indicate no opinion as to any claim Perez & Co. may make against Branch for loss due to delay in returning the check.

Affirmed.